**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

NATIONAL LIFE INSURANCE    :
COMPANY,    :
   :
        Plaintiff,    :
   :    CIVIL ACTION NO.
      v.    :    1:07-CV-0557-JOF
   :
VICTORIA ALEMBIK-EISNER,    :
Trustee of the Abraham Henry    :
Madenfrost Revocable Trust, et al.,    :
   :
       Defendants.    :

**<u>OPINION AND ORDER</u>**

This matter is before the court on Victoria Alembik-Eisner's motion for summary

judgment as to the counterclaim of the A.H. Madenfrost Revocable Trust [25] and National

Life Insurance Company's motion to dismiss [34].

**I.     Background**

**A.     Procedural History and Facts**

Plaintiff, National Life Insurance Company, filed this interpleader action against

Defendants, Victoria Alembik-Eisner, Trustee of the Abraham Henry Madenfrost Revocable

Trust ("Trustee"); Doris Gicherman DeMadenfrost; Monica Elka Madenfrost; Jaqueline

Jaguit Madenfrost la Alameda; and Amasilis Del Carmen Gonzales Nahmens, on March 8,

2008. The interpleader res is a life insurance policy of $250,000 payable on the death of Abraham Henry Madenfrost ("Madenfrost").

The facts of this case are generally undisputed. Madenfrost first applied for a life insurance policy from National Life in January 1990. *See* Cmplt., ¶ 10. The application listed the beneficiary as Doris Gicherman DeMadenfrost, his wife at the time. *Id.*, ¶ 11. On May 17, 1990, Madenfrost created a revocable trust named the Abraham Henry Madenfrost Revocable Trust. *Id.*, ¶ 14. The trust document provided:

> On my death the Trustee shall collect the proceeds of any insurance policies of which it is beneficiary and receive any property conveyed to it under the terms of my Will. My Trustee shall continue to hold this property, along with any other property conveyed to this trust during my lifetime, in the Family Trust for the benefit of my spouse and my descendants.

*Id.*, ¶ 15. The trust document also provided that the trust was revocable "so long as I [Madenfrost] am physically and mentally capable of managing my affairs (as determined by the Trustee in its sole discretion . . . ." *Id.* ¶ 16. Madenfrost named as co-trustees his sister, Defendant Victoria Alembik-Eisner, and her husband, Michael D. Alembik. *Id.*, ¶ 17. Madenfrost submitted to National Life an Absolute Assignment of his insurance policy to the Revocable Trust on May 21, 1990. *Id.*, ¶ 19.

On February 5, 1993, Michael D. Alembik died leaving Victoria Alembik-Eisner as the sole trustee. *Id.*, ¶ 20. Madenfrost and his wife Doris Gicherman DeMadenfrost divorced in Venezuela on November 2, 1993. *Id.*, ¶ 21. Before their divorce, Madenfrost

AO 72A
(Rev.8/82)

and Doris Gicherman DeMadenfrost had two children, Defendants Jaqueline Jaguit Madenfrost La Alameda and Monica Elka Madenfrost. *Id.*, ¶ 22.

In 1996, Madenfrost was remarried to Defendant Amasilis Del Carmen Gonzales Nahmens. *Id.*, ¶ 23. "While it has been reported to National Life that Madenfrost and Amasilis Del Carmen Gonzales Nahmens had children while they were married, that information has not been confirmed and the names of any such children have not been provided to National Life." *Id.*, ¶ 24.

On October 28, 2002, Madenfrost executed a Notice of Revocation of Revocable Trust directing the co-trustees of the trust "to transfer the assets according to any further directions given to them by me [Madenfrost]." *Id.*, ¶ 25. When National Life received the Notice of Revocation, it wrote to Victoria Alembik-Eisner on November 21, 2002, to ask whether the trust had been given any direction to transfer ownership and, if so, the contact information for the new owner. *Id.*, ¶ 26. Victoria Alembik-Eisner did not respond to this letter. *Id.*, ¶ 27.

Madenfrost and his second wife, Amasilis Del Carmen Gonzales Nahmens, were divorced in Venezuela on November 24, 2004. *Id.*, ¶ 28. Madenfrost died in Venezuela on April 2, 2006. *Id.*, ¶ 29. Madenfrost was not married at the time of his death. *Id.*, ¶ 30.

On April 12, 2006, National Life wrote to Victoria Alembik-Eisner stating that it was unable to identify the beneficiary of the death benefits payable under the policy due to

AO 72A
(Rev.8/82)

Madenfrost's revocation of the trust. *Id.*, ¶ 31. National Life asked for information on how the assets of the trust were distributed. *Id.* On August 3, 2006, National Life received a fax from H.R. Hauenstein, identified as Madenfrost's friend and insurance agent, stating: "Henry [Madenfrost] and his sister, Vicky Alembik-Eisner were at odds. Henry tried to get Rick Alembik who is a lawyer to get Vicky to make the changes Henry wishes to no avail. Henry's <u>only</u> interest was to take care of his second wife and their children." *Id.*, ¶ 32.

On September 5, 2006, Victoria Alembik-Eisner wrote to National Life, making a formal demand of payment from National Life, stating:

> You are hereby advised that at the time my brother executed the notice of revocation, and at all times thereafter, he was not physically and mentally capable of managing his affairs. As set forth in the governing document, the determination as to the capacity of the Trustor and the Trustor's legal right to revoke the Trust was given to me, in my sole and absolute discretion, as the sole Trustee.

> The policy . . . was in force at the time of my brother's death and was owned by me, as the Trustee of the Trust. My brother had no legal right to revoke the Trust in 2002, and any correspondence he sent to your company was void and of no legal consequence. Under the terms of the policy, the Trust is entitled to payment of the death benefit, subject to any appropriate adjustments, upon the death of my brother.

*Id.*, ¶ 34.

National Life claims that "[w]hether Madenfrost's revocation of the trust was valid under Georgia law is unclear. In addition, the identity of the owner of the policy at the time of Madenfrost's death, and the identity of the beneficiar(ies) of the policy are unclear.

4

Finally, whether Madenfrost sufficiently manifested his intent and took adequate steps to revoke the trust and to change the beneficiar(ies) of the policy to Defendant Amasilis Del Carmen Gonzales Nahmens and his children of that marriage is unclear." *Id.*, ¶ 37. Concerned that it would be faced with multiple litigation and liability, National Life filed the instant interpleader action. *Id.*, ¶ 38.

On March 13, 2007, the court granted National Life's request to deposit $273,535.22 into the registry of the Court. Madenfrost's two children from his first marriage were served with process in the interpleader action. They subsequently signed affidavits which were submitted by the Trustee in connection with her answer to the interpleader complaint. Those affidavits indicate that the two children wished for the insurance benefits to be paid to Victoria Alembik-Eisner in her capacity as Trustee.

With her answer, Defendant Victoria Alembik-Eisner also filed a counterclaim alleging claims of breach of contract, interest, and bad faith denial of claim. She also sought a declaratory judgment that the Trust is the sole owner of the policy and asked the court to determine that this is not a proper case for interpleader based on the fact that National Life refused to immediately pay out the death benefits to the Trust. The Trustee also filed the instant motion for summary judgment as to her counterclaims on behalf of the Abraham Henry Madenfrost Revocable Trust.

5

On December 17, 2007, National Life filed the affidavit of Madenfrost's second wife, Amasilis Del Carmen Gonzales Nahmens, in which she states that she is the former wife of Madenfrost but they had no children together. She further testifies that she believes Madenfrost's only children to be those he had with his first wife, Doris Gicherman Madenfrost. She and Madenfrost were divorced in Venezuela on November 23, 2004. Amasilis Del Carman Gonzales Nahmens acknowledged that she was aware of the instant lawsuit and understood that proceeds from an insurance policy were in dispute, but she disclaims any right to the proceeds, hoping that they would be paid to Madenfrost's children from his first marriage. Thereafter, National Life filed the instant motion to dismiss asking that because all defendants have been served with process, it be dismissed from the action, granted a permanent injunction against further legal proceedings, and be awarded its costs and attorney's fees.

### B.    Contentions

The Trustee argues that National Life improperly filed an interpleader action because Madenfrost's attempted revocation could not have been valid under Georgia law and therefore no other claimant had a valid claim on the proceeds of the insurance policy. The Trustee further contends that the court does not have jurisdiction over the interpleader action because there is no adverse or potentially adverse claim. The Trustee avers that National Life is liable to it for breach of contract, interest, and bad faith refusal to pay.

6

National Life contends that at the time it filed the interpleader action, it had a good faith basis to believe that it was subject to multiple claims because it did not know whether Madenfrost's revocation was valid and did not know whether Madenfrost had had any children with his second wife. Under these circumstances, National Life argues that it was proper to file an interpleader action. National Life further avers that it cannot be liable to the Trustee because it never refused to pay out the benefits on the insurance policy and paid them into the registry of the court. Finally, National Life asks that the court dismiss it from the interpleader action and grant its motion for attorney's fees.

## II.     Discussion

### A.     Nature of Interpleader Action

The crux of the case comes down to a decision about whether it was appropriate for National Life to file an interpleader action or whether it was under an obligation to investigate further and make a determination about the validity of Madenfrost's attempted Notice of Revocation of the Revocable Trust and whether he had any additional children with his second wife.

The Trustee argues that for the court to have jurisdiction, there must be "actual claims" against the interpleader. *See* Motion for S.J., at 18. The court disagrees with this assertion. Under the terms of the statute, § 1335 can be used where "[t]wo or more adverse claimants, of diverse citizenship . . . [who] *are claiming or may claim* to be entitled to such

money or property . . . ." *Id.* (emphasis added). Thus, an actual claim need not exist but rather only the possibility that more than one person will claim. It is true that an interpleader action requires "real fear of the vexation and hazard of conflicting claims." *See*, *e.g.*, *Bierman v. Marcus*, 246 F.2d 200 (3d Cir. 1957). However, this

> remedy was developed by equity so that a stakeholder could avoid being subjected to such hazard and vexation. Thus, in the very nature of the problem it seeks to solve, the federal Interpleader Act requires "adverse claimants" who are claiming or may claim the same fund. Of course, only one claim will ultimately be sustained. Thus, jurisdiction in interpleader is not dependent upon the merits of the claims of the parties interpleaded, and a plaintiff can maintain the action even though he believes that one of the claims is valid and the other, or others, without merit.

> On the other hand, that which is advanced as an adverse claim may be so wanting in substance that interpleader under the statute may not be justified. While the stakeholder is not obliged at his peril to determine which claimant has the better claim, he must have some real and reasonable fear of exposure to double liability or the vexation of conflicting claims.

*Id.* at 202 (quotations and citations omitted). In *Bierman*, the court concluded that there was only the "pretense" of adverse claims used to "obtain adjudication of controversies other than entitlement to that fund." *Id.* at 203; *see also Hunter v. Federal Like Insurance Co.*, 111 F.2d 551, 556 (8th Cir. 1940) ("It is our opinion that a stakeholder, acting in good faith, may maintain a suit in interpleader for the purpose of ridding himself of the vexation and expense of resisting adverse claims, even though he believes that only one of them is meritorious.").

8

At the time National Life had to make a decision about to whom to pay out the benefits, it had to consider among the following potential claims: (1) Madenfrost's estate (by virtue of the insurance policy which stated that if no beneficiary was named, the proceeds would go to the estate), (2) Madenfrost's descendants, the children from his first marriage and any from his second (at the time it was not definitively known whether there were any), (3) Madenfrost's second wife (as Madenfrost attempted to revoke the trust assignment in favor of her), or (4) Victoria Alembik-Eisner in her capacity as Trustee. To make a determination as to the proper beneficiary, National Life would be required to interpret the Trust document and its provisions regarding the revocability of the Trust. The question as to the appropriateness of interpleader is not whether one particular claimant ultimately is determined to have the rights to the proceeds. Rather, the question is whether at the time demand for payment was made on National Life, it had reasonable fear of multiple liability. The court concludes that it did.

Victoria Alembik-Eisner argues that there should have been no question that Madenfrost's attempted revocation of the trust was invalid. She further contends that there was no question that Madenfrost had only two children with his first wife and no others. While these facts may be determinative on the merits, they do not mean that National Life had no uncertainty to justify the filing of an interpleader action. The Trustee's argument discounts the August 3, 2006 fax sent to National Life by W. Richard Hauenstein which

states that Madenfrost and his sister were not getting along and she had refused to make the changes to the trust that he wished. That correspondence also indicated that Madenfrost had children with his second wife and he desired to care for them through the Trust.

Alembik-Eisner contends that National Life should not be entitled to protection from this correspondence because of prior correspondence between W. Richard Hauenstein and Sherry Gallison, Title Service Representative of National Life. Ms. Gallison wrote:

> This letter is a follow up to a voice mail message left for you on 3/13/03, regarding the proposed transfer of ownership of this policy from the trust to the Insured.
>
> You indicated that there has been some difficulty in obtaining the signature of Victoria Alembik-Eisner, Trustee to transfer the policy.
>
> We have reviewed the trust document we have on file and we cannot find that there are any provisions which would allow the Trustor/Grantor or the trust beneficiaries to remove a trustee and appoint a replacement.
>
> We are also unable to use the "Notice of Revocation of Revocable Trust" to make the actual transfer as the document specifically states "the Co-Trustees are hereby requested to liquidate or to transfer the trust assets according to any further directions given to them by me" (the trustor). It would appear that the trustees must sign to make the transfer.
>
> As an alternative perhaps the Mr. Madenfrost could check with his attorney to see if they could request the court to remove Ms. Alembik-Eisner as a trustee and appoint a successor which could then sign for the transfer of ownership.

*See* National Life's Reply, Exh. G. This correspondence, however, is far from a declaration by National Life that the attempted revocation was invalid. The fact that a claims

representative speculated in March 2003 that there were problems with the attempted revocation and corresponded with Mr. Hauenstein, as a representative of Madenfrost, in an attempt to resolve the situation, is not a definitive indicator of the lack of validity of the Notice of Revocation, but rather demonstrates that National Life had been uncertain as to the status of the Trust for some period.

Further, the fact that Madenfrost's second wife eventually disclaimed any right to the proceeds and informed the court that she and Madenfrost had no children does not "make the interpleader action inappropriate but merely expedited its conclusion by obviating the normal second stage" of the action to determine who should receive the benefits of the policy. *See New York Life Ins. Co. v. Connecticut Development Authority*, 700 F.2d 91, 95 (2d Cir. 1983). National Life attempted to locate Madenfrost's second wife at her last known address in Texas, and also consulted with Mr. Hauenstein and the human resources office at Madenfrost's former employer in an attempt to locate her. A private investigator in Texas was not able to locate Ms. Gonzales Nahmens, nor could the Trustee give any information as to her whereabouts. National Life then concluded that she must have returned to Venezuela. It was not until after National Life filed the interpleader action that it was able to locate Ms. Gonzales Nahmens in Venezuela and have her disclaim any right to the insurance proceeds.

11

The court finds the Trustee's argument that National Life delayed in bringing the interpleader action to be unpersuasive. The potential claimants to the proceeds of the insurance policy were scattered among several foreign nations. National Life's investigation involved communication with Madenfrost's insurance agent, former employer, researching divorce records in foreign countries and other such activities. The court has no doubt that such efforts take time.

Significantly, there is no evidence that National Life has or had any alternative agenda. National Life has never disputed that it would pay out the $250,000. It has only found uncertainty in the consequence of the attempted revocation and uncertainty in the fact of whether Madenfrost had any children by his second wife. The Trustee has presented no information in the record from which the court could conclude that National Life was not acting in good faith when it initiated the interpleader action.

For the foregoing reasons, the court has determined that National Life's utilization of the interpleader statute was not in bad faith or improper. The court further finds that there is no problem with jurisdiction because National Life had a reasonable fear that it would be subject to multiple claims.

### B.      State Law Claims

Numerous courts have discussed the interaction of the interpleader statute with a state law claim of bad faith. For example, in *LaMarche v. Metropolitan Life Insurance Co.*, 236

AO 72A
(Rev.8/82)

F. Supp. 2d 50 (D. Me. 2002), the court found that while the "§ 1335 interpleader action exists to prevent the stakeholder from having to defend more than one action, [i]t does not exist to prevent the stakeholder from having to be a party in any action or from defending independent claims." *Id.* at 55. The *LaMarche* court contrasted *Metropolitan Life Insurance Co. v. Barretto*, 178 F. Supp. 2d 745 (S.D. Tex. 2001), where the court rejected claims of untimely payment against the insurance company finding that the company had not engaged in "unreasonable or inexcusable delay" in filing the interpleader action. *See also Minnesota Mutual Life Insurance Co. v. Ensley*, 174 F.3d 977 (9th Cir. 1999) (granting summary judgment to insurer on counterclaims based on unique facts of case); *Dakota Livestock Co. v. Keim*, 552 F.2d 1302, 1307 (8th Cir. 1977) (permitting counterclaims in interpleader actions "serves the purpose of Sect. 1335 and Rule 22 by protecting a stakeholder who may be subject to independent liability from double litigation even if not from double liability.").

Other courts view the protection of the interpleader action more broadly. For example, in *Commerce Funding Corp. v. Southern Financial Bank*, 80 F. Supp. 2d 582 (E.D. Va. 1999), the court stated, "[w]ere the defendants in an interpleader action permitted to carry forward with counterclaims against the stakeholder based upon the same interpleaded funds, the very purpose of the interpleader action would be utterly defeated." *Id.* at 585. *See also Daniels v. Equitable Life Assurance Society of the United States*, 35 F.3d 210, 214-15 (5th Cir. 1994) (where an interpleader is found proper, breach of contract and tort claims

are collaterally estopped); *Barretto*, 178 F. Supp. 2d at 748 ("The claims of untimeliness of payment against MetLife are the result of its utilizing the protections afforded by the interpleader. Under interpleader rules and the interpleader statutes, MetLife should be shielded from [defendant's] counterclaims, which should be dismissed. MetLife should also be awarded attorney's fees.").

The court finds that these various approaches can be reconciled. While the mere filing of the interpleader action does not "immunize" the insurer from state law counterclaims filed by a claimant, if the interpleader action is properly filed, it is possible that the merits of the state law counterclaims could be rejected. That is to say, the question is whether the counterclaims are independent of the reason for the filing of the interpleader action. For example, in *LaMarche*, there were allegations that the insurance company did not properly change the beneficiary on the insurance policy. This is a different question than whether the insurance company knew to whom to pay the benefits and whether its decision to interplead rather than pay out was appropriate.

Here, the counterclaims raised by the Trustee relate directly to the reason for the interpleader action. National Life decided it could not pay out the insurance policy benefits because to do so, it would have to make a decision under Georgia law as to whether Madenfrost's attempted revocation was valid, a question which would further involve the interpretation of a legal document outside the insurance policy. Therefore, National Life

14

decided to deposit the funds of the policy into the registry of the court and have a court determine the valid claimant. This context obviously impacts the court's consideration of the merits of the Trustee's state law claims.

The Trustee claims bad faith refusal to pay pursuant to O.C.G.A. § 33-4-6 which provides:

> [i]n the event of a loss which is covered by a policy of insurance and the refusal of the insurer to pay the same within 60 days after a demand has been made by the holder of the policy and a finding . . . that such refusal was in bad faith, the insurer shall be liable to pay such holder, in addition to the loss, not more than 50 percent of the liability of the insurer for the loss or $5,000.00, whichever is greater, and all reasonable attorney's fees for the prosecution of the action against the insurer.

*Id.* Georgia courts have found that to

> support a cause of action under O.C.G.A. § 33-4-6, the insured bears the burden of proving that the refusal to pay the claim was made in bad faith. Bad faith is shown by evidence that under the terms of the policy upon which the demand is made and under the facts surrounding the response to that demand, the insurer had no good cause for resisting and delaying payment. Good faith is determined by the reasonableness of nonpayment of a claim. Because the damages are in the nature of a penalty, the statute is strictly construed and the right to such recovery must be clearly shown. Although the question of good or bad faith is ordinarily for the jury, the insurer is entitled to judgment as a matter of law if it has reasonable grounds to contest the claim or the question of liability is close.

*Atlantic Title Insurance Co. v. Aegis Funding Corp.*, 287 Ga. App. 392, 393 (2007) (quotations and citations omitted). As evidence of bad faith, the Trustee points to the same arguments she made with respect to the propriety of National Life's interpleader action – the

fact that Madenfrost did not have children with his second wife, and that Item I of the Trust Instrument vests absolute authority in the Trustee to approve any attempted revocation by Madenfrost.

Although other state courts have explicitly held that a claim for bad faith cannot stand in an interpleader action, *see*, *e.g.*, *Monumental Life Ins. Co. v. Lyons-Neder*, 140 F. Supp. 2d 1265, 1270 (M.D. Ala. 2001), no Georgia court has so explicitly held. The court notes, however, that in *Morris v. Mutual Benefit Life Ins. Co.*, 258 F. Supp. 186 (N.D. Ga. 1966) (Smith, J.), the court held that the purpose of the bad faith statute "was not to penalize an insurer for appealing to the courts where there are questions concerning an insurance contract which are sufficiently doubtful to justify adjudication." *Id.* at 192.

The court found above that National Life did not act in bad faith in filing the interpleader action. The court finds likewise that it has not acted in bad faith in refusing to pay out the proceeds of the policy. In fact, National Life has paid out the policy – into the registry of the court. *See also Daniels v. Equitable Life Assurance Society of the United States*, 35 F.3d 210, 214-15 (5th Cir. 1994) (applying Texas law and holding that if state court determined insurance company's interpleader action was appropriate, insured was collaterally estopped from asserting in federal court that insurer breached duty by interpleading funds).

The Trustee also claims interest under O.C.G.A. § 33-25-10(b)(2) which provides that when no action has been commenced to recover proceeds due under a policy, but a claim has been filed with the insurer, the insurer must pay interest at a rate of 12 percent beginning 30 days after the date of death until the date of full payment. *Id.* The code section specifically "shall not (4) require the payment of interest for any period during which an insurer is required to pay interest under any state or federal law pertaining to interpleader." *Id.*, § 33-25-10(c). Here, however, an action has been filed concerning the proceeds and the policy amount has been deposited into the registry of the court which accrues interest. The Trustee has not demonstrated to the court that the Trust is entitled to any interest additional to what is already accruing on the $250,000. The court DENIES Victoria Alembik-Eisner's motion for summary judgment as to the counterclaims of the A.H. Madenfrost Revocable Trust [25].

### C.   Attorney's Fees

National Life seeks attorney's fees for bringing the interpleader action, in locating and serving Gonzales Nahmens and the other defendants, and in defending against the Trustee's counterclaim. National Life asserts that it has incurred $40,132 in attorney's fees and $8,243.15 in other expenses. The majority of the attorney's fees sought are attributed to Aaron Pohlman, an attorney with the law firm of Smith Moore, LLP, who is billed at the rate of $230 per hour. *See* Affidavit of H. Sanders Carter, ¶ 3. The expenses include

17

$1,661.34 in translation fees, $160 in private investigator fees, $262.90 for court reporting, $32 in courier fees, and $6,040.56 in attorney and private investigator fees and related expenses in Venezuela. *Id.*, ¶ 4.

In *Perkins State Bank v. Connolly*, 632 F.2d 1306 (5th Cir. 1980), the court discussed the purpose of federal interpleader actions as "protect[ing] a stakeholder who holds funds claimed by two or more adverse parties from multiple liability." *Id.* at 1311. "Although costs and attorney's fees are generally awarded by federal courts to the plaintiff who initiates the interpleader as a mere stakeholder, the plaintiff who enters the conflict (by contesting the ownership of the fund or by disputing the correct amount of his liability) will not, in the absence of special circumstances, be awarded any expenses." *Id.*

> State rules of decision which deny an uninterested stakeholder the recovery of attorney's fees interfere with the protective purpose of the interpleader statute and therefore do not bind federal courts. But state rules of decision which merely regulate the recovery of attorney's fees among adverse state law claimants do not hinder the operation of the federal interpleader statute and therefore should be applied as in any other diversity action.

*Id.* Courts note, however, that it is not necessary to award attorney's fees in interpleader actions where the expenses incurred by the interpleader are those which occur in the normal course of business. *See*, *e.g.*, *Correspondent Services Corp. v. J.V.W. Investments, Ltd.*, 204 F.R.D. 47, 49 (S.D.N.Y. 2001); *Travelers Indemnity Co. v. Israel*, 354 F.2d 488, 490 (2d Cir. 1965) ("We are not impressed with the notion that whenever a minor problem arises in

18

the payment of insurance policies, insurers may, as a matter of course, transfer a part of their ordinary cost of doing business of their insureds by bringing an action for interpleader.").

Wright's Federal Practice and Procedure suggests that awards of attorney's fees in interpleader actions do not involve a great deal of money because "all that is necessary is the preparation of a petition, the deposit in the court or posting of a bond, service on the claimants, and the preparation of an order discharging the stakeholder." *Id.*, § 1719. Five factors relevant to the award of fees are whether: (1) the case is simple, (2) the stakeholder performed any unique services for the claimants or the court, (3) the stakeholder acted in good faith and with diligence, (4) the services rendered were beneficial, and (5) the claimants improperly protracted the proceedings. *Id.*

Here, the court finds that the number of claimants and their various locations means that the action was not particularly simple. National Life did locate, serve, and produce the affidavit of Madenfrost's second wife disclaiming any interest in the proceeds, an effort which simplified the proceedings. The court also found above that National Life had acted in good faith and rendered beneficial services. Finally, the court finds that the nature of the Trustee's counterclaim did serve to protract the proceedings. It is not clear to the court why the Trustee did not proffer her claim to the insurance benefits without bringing unnecessary state law claims into the interpleader action. The court finds that the determination of whether Madenfrost had any children with his second wife and the uncertainty of whether

the attempted revocation was valid go beyond simple problems faced in the ordinary course of doing business.

For these reasons, the court concludes that National Life is entitled to attorney's fees and expenses for the filing of the interpleader action. The Trustee argues only against the general propriety of granting attorney's fees to National Life, but does not raise any specific argument as to the amount of those fees. Under *Barnes v. ACLU*, 169 F.3d 423 (11th Cir. 1999), and *Norman v. Housing Authority*, 832 F.2d 1292 (11th Cir. 1988), the court finds that attorney's fees in the range of $220 to $270 per hour and paralegal fees of $125 per hour are reasonable. Further, the court finds that 177 hours of legal work in this matter is not unreasonable considering the factual circumstances of the interpleader claimants and the counterclaims of the Trustee.

### D.    Summary

The court finds that National Life acted in good faith in filing the instant interpleader action and therefore denies the Trustee's motion for summary judgment as to the Trustee's state law insurance claims.

With the affidavit of Amasilis Del Carmen Gonzales Nahmens disclaiming any interest in the proceeds of the insurance policy, the only remaining claimant is Victoria Alembik-Eisner as Trustee of the Abraham Henry Madenfrost Revocable Trust. The court discharges National Life from further liability in this action and awards National Life

20

$40,132 in attorney's fees and $8,243.15 in expenses to be paid out of the funds in the registry.

The Clerk of the Court is DIRECTED to pay the totality of funds in the registry in this case, less $48,375.15 to Victoria Alembik-Eisner as Trustee of the Abraham Henry Madenfrost Revocable Trust. The Clerk of the Court is DIRECTED to pay $48,375.15 to National Life.

**III.    Conclusion**

The court DENIES Victoria Alembik-Eisner's motion for summary judgment as to the counterclaim of the A.H. Madenfrost Revocable Trust [25] and GRANTS National Life Insurance Company's motion to dismiss [34].

The Clerk of the Court is DIRECTED to close this case.


**IT IS SO ORDERED** this 12th day of September 2008.


_____s/ J. Owen Forrester_____
J. OWEN FORRESTER
SENIOR UNITED STATES DISTRICT JUDGE

AO 72A
(Rev.8/82)